MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2017 ME 24
Docket:        Was-16-127
Submitted
  On Briefs:  November 29, 2016
Decided:      February 2, 2017

Panel:         SAUFLEY, C.J., and ALEXANDER, <u>MEAD</u>, JABAR, HJELM, and HUMPHREY, JJ.

MIDLAND FUNDING LLC

v.

MARK WALTON

MEAD, J.

[¶1]  Mark Walton appeals from a judgment entered in the District Court (Calais, *Romei, J.*) in favor of Midland Funding LLC in the amount of $5,684.72 plus costs of court.  Walton argues that the District Court lacked jurisdiction over the matter pursuant to language in the credit card agreement and asserts that the court erred in admitting documentation of the assignment of his debt to Midland Funding from Barclays Bank Delaware pursuant to the business records exception to the hearsay rule.  We affirm the judgment.

I.  BACKGROUND

[¶2]  On February 26, 2015, Midland Funding filed a complaint against Walton alleging that he had entered into a credit card agreement with Barclays Bank Delaware in April 2008, used the card to obtain extensions of credit, and

failed to make payments on the account since March 2009. The complaint asserted that "[a]ll of the rights, titles, and interest" in Walton's account had been "assigned, endorsed and set over" to Midland Funding, and it sought to collect an outstanding balance of $5,684.72.

[¶3] On October 26, 2015, Walton filed a motion to dismiss alleging that the District Court did not have jurisdiction over the matter. He argued that pursuant to language in his credit card agreement, the matter should have instead been brought in "small claims" court.[1] The following day, the court granted the motion. On October 30, Midland filed a motion for findings of fact and conclusions of law and a motion for reconsideration, to which Walton filed no response. Noting that no opposition had been filed, the court granted the motion for reconsideration and denied Walton's motion to dismiss.

[¶4] The court held a bench trial on February 8, 2016. Walton asked the court to reconsider his motion to dismiss based on lack of jurisdiction, but the court reaffirmed its prior ruling denying the motion. In support of its complaint, Midland called as a witness Cassandra Praught, an employee of

---

[1] Midland Funding asserts that Walton's motion must be treated as a motion for summary judgment because he attached exhibits to the motion, including an excerpt of the card agreement terms and conditions. However, M.R. Civ. P. 12(b) provides that this principle applies only to a motion to dismiss pursuant to Rule 12(b)(6), and Walton's motion to dismiss was based on lack of jurisdiction pursuant to Rule 12(b)(1).

Midland Credit Management (MCM).  Praught has worked for two years as a "legal specialist and custodian of records" for MCM; her job duties require her to "review legal documents and verify information contained within Midland's business records, as well as testify telephonically."

[¶5]  According to Praught, MCM is a debt servicer and affiliate company of Midland Funding.  She explained that Midland is in the business of purchasing distressed debt, including from Barclays Bank.  While Midland Funding, which has no employees and is controlled by a board of directors, handles the debt purchasing process, MCM incorporates pertinent documents into its business records.  Praught testified that when Midland purchases debt from Barclays, records from the assignment are transferred electronically with an electronic sale file and are uploaded to a secure website.  MCM then pulls the records from that website and loads them into its system.  Praught has been trained in these "on-boarding processes" and on the computer systems used to hold the records, and she has access to the electronic records for defaulted accounts.  She explained that once the documents are integrated into Midland's records, they are password protected and not altered.

[¶6]  Praught testified that part of her job is to verify that information in relevant documents matches the information in Midland's system that it

4

received from Barclays. Praught testified she does not have any particularized knowledge of the internal policies or practices of any of the companies from which Midland purchases debt, but that "Midland buys from reputable sellers and we work with them on a regular basis." She does have "an overview training of the process" by which Midland purchases accounts.

[¶7] At the trial, Midland sought to introduce in evidence a bill of sale as proof of the assignment of Walton's debt from Barclays to Midland. Praught identified the specific bill of sale between Barclays and Midland and explained that this document was obtained from Barclays on or about the time of sale. She noted that such bills of sale and assignment are always obtained when Midland purchases debt and are transferred to Midland electronically and incorporated into its business records. Praught testified that she knew Walton's account was included in the sale because each included account is listed in the electronic sale file, and when the data is entered into Midland's system, a "field data sheet"[2] is created that includes extracted, isolated account information. A field data sheet for Walton's account was proffered with the bill

---

[2] At one point, Praught responded to a question about the redacted assignment by describing what seemed to be the field data sheet. Considering her other testimony and the content of the documents, we presume that the "bill of sale" is the same document as the "redacted assignment," while the field data sheet is a separate document, offered with the bill of sale, that contains the summary of Walton's account information.

of sale, and it indicates that it was printed by MCM from the electronic records provided by Barclays in connection with the sale from Barclays to Midland. Praught testified that she personally checked the documents that she testified from at trial against the information in the electronic sale file to verify that the information "matched." Walton objected to the admission of these documents on the basis that they lacked foundation, but the court admitted the records.

[¶8] Midland also introduced in evidence over Walton's objection Walton's credit card application to Barclays and several of Walton's credit card statements. Praught testified that Midland's regular business practice was to send out a validation letter to each consumer stating the amount owed on the account, the original account number, the original creditor, and a statement that Midland has purchased the account and is attempting to collect the debt. She testified that a copy of this document for Walton's account was stored in the electronic files, and that she had the ability to produce it if requested. She testified that Midland received no reply disputing Walton's account.

[¶9] Following Praught's testimony, Midland offered in evidence a set of admissions by Walton pursuant to M.R. Civ. P. 36. In the admissions, Walton admitted that he was issued a credit card from Barclays, used the card to purchase goods and services or make cash advances, failed to make payments

6

on the card, and breached the card agreement. He denied that Barclays mailed him an account statement on November 16, 2009, stating the balance due on his account, but he admitted that he had received the statement and that the amount owed according to the statement was $5,684.72. He denied that the rights to his account were transferred to Midland and that he owed the balance on his account to Midland. Walton presented no witnesses or exhibits at the trial.

[¶10] The court entered judgment in favor of Midland Funding for $5,684.72 plus costs of court. Walton appeals. *See* M.R. App. P. 2.

## II. DISCUSSION

A.    Subject Matter Jurisdiction

[¶11] Walton challenges the court's jurisdiction in this matter, asserting that the District Court does not have jurisdiction because the credit card agreement states that the parties may only resolve conflicts via arbitration or as a small claims proceeding in Maine.

[¶12] We review de novo whether a trial court has subject matter jurisdiction. *Windham Land Trust v. Jeffords*, 2009 ME 29, ¶ 19, 967 A.2d 690. "If the District Court lacked subject matter jurisdiction, we would have to vacate its order." *Landmark Realty v. Leasure*, 2004 ME 85, ¶ 6, 853 A.2d 749.

[¶13]  The agreement on which Walton relies provides that in the event of a dispute, the parties must submit to binding arbitration, or

> [a]s an exception to arbitration you and we may pursue a Claim within the jurisdiction of the Justice of the Peace Court in Delaware, or the equivalent court in your home jurisdiction (each a "Small Claims Court") . . . .

[¶14]  The Delaware Justice of the Peace Court has civil jurisdiction over, inter alia, common law actions in contract when the amount of damages sought is less than $15,000.  Del. Code Ann. tit. 10, § 9301(1) (2016).  The Justice of the Peace Court is governed by procedural rules, which prescribe procedures for matters such as discovery and motion practice, *see* Del. J.P. Ct. Civ. R. 1-112, and the Rules of Evidence apply in its proceedings.  Del. R. Evid. 1101(a)-(b).

[¶15]  Similarly, the Maine District Court has original jurisdiction, concurrent with the Maine Superior Court, over civil actions seeking money damages.  4 M.R.S. § 152(2) (2016).  It, too, is governed by comprehensive procedural rules, *see* M.R. Civ. P. 1-140, and, with a few exceptions, the Maine Rules of Evidence apply to District Court proceedings, M.R. Evid. 101(a)-(b).

[¶16]  On the other hand, small claims proceedings in Maine share fewer similarities with the Delaware Justice of the Peace Court.  Small claims actions, over which the District Court has exclusive jurisdiction, 4 M.R.S. § 152(4) (2016), involve "a right of action cognizable by a court if the debt or damage

does not exceed $6,000 exclusive of interest and costs" that does not involve title to real estate, 14 M.R.S. § 7482 (2016). Further, small claims proceedings are governed by separate, succinct procedural rules, *see* M.R.S.C.P. 1-18, and the Maine Rules of Evidence do not apply in small claims proceedings, M.R. Evid. 101(b)(4).

[¶17] In light of the similarities of the civil jurisdiction and procedures of the Delaware Justice of the Peace Court and the Maine District Court, we are satisfied that the District Court is the "equivalent court" to the Delaware Justice of the Peace Court. The reference to "small claims court" in the card agreement was likely a generic reference to courts of specific civil jurisdiction and not a limitation only to actions undertaken pursuant to the Small Claims Act, 14 M.R.S. §§ 7481-7487 (2016).[3] Jurisdiction over this matter is properly established in the Maine District Court.

B.      Business Records Exception to Hearsay

[¶18] Because Walton does not dispute the existence or amount of his credit card debt, we address only his argument that Praught was not a qualified

---

[3] We note that Maine has no free-standing "small claims court." The Small Claims Act establishes only a "simple, speedy and informal" means for litigating claims in the District Court. 14 M.R.S. § 7481 (2016). We also note that the Rules of Evidence, upon which Walton relies to seek to exclude evidence of the sale of the debt to Midland from Barclays, do not apply in small claims actions. *See* M.R. Evid. 101(b)(4).

witness to provide the foundation for the bill of sale and assignment between Barclays and Midland as a business record. "When admission of evidence under the business records exception to the hearsay rule is challenged, we review a trial court's foundational findings to support admissibility for clear error and its ultimate determination of admissibility for an abuse of discretion." *Am. Express Bank FSB v. Deering*, 2016 ME 117, ¶ 12, 145 A.3d 551 (quotation marks omitted).

[¶19]  Maine Rule of Evidence 803(6), which governs the admissibility of business records, provides that the following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

> **(6)  Records of a regularly conducted activity.**  A record of an act, event, condition, opinion, or diagnosis if:
>
> (A)  The record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B)  The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) Making the record was a regular practice of that activity;
>
> (D)  All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11), Rule 902(12) or with a statute permitting certification; and
>
> (E)  Neither the source of information nor the method or

circumstances of preparation indicate a lack of trustworthiness.

[¶20]  Ordinarily these elements must be established by a "custodian or other qualified witness—that is, a person who was intimately involved in the daily operation of the business and whose testimony showed the firsthand nature of his or her knowledge." *Bank of Am., N.A. v. Greenleaf*, 2014 ME 89, ¶ 25, 96 A.3d 700 (citation and quotation marks omitted).  The affiant establishing the foundation for a business record need not personally prepare or supervise preparation of the record to provide the foundation, *State v. Abdi*, 2015 ME 23, ¶ 17, 112 A.3d 360, and "need not be an employee of the record's creator," *Beneficial Maine Inc. v. Carter*, 2011 ME 77, ¶ 13, 25 A.3d 96.  If records were "received and integrated into another business's records and were relied upon in that business's day-to-day operations, an employee of the receiving business may be a qualified witness."  *Id*.  In those situations, "records will be admissible pursuant to the business records exception . . . if the foundational evidence from the receiving entity's employee is adequate to demonstrate that the employee had sufficient knowledge of both businesses' regular practices to demonstrate the reliability and trustworthiness of the information."  *Id.*

[¶21]  Praught was qualified to lay the foundation for the record documenting the assignment of Walton's debt from Barclays to Midland

Funding based upon her knowledge of Midland's and MCM's practices in purchasing debt from credit card issuers. Praught was not an employee of Midland Funding LLC itself, but of MCM—a company affiliated with Midland. Her job title at MCM is "legal specialist and custodian of records." She is duly authorized by Midland Funding's board of directors to testify on behalf of Midland. She testified that Midland has no employees—only a board of directors—and that MCM is a company affiliated with Midland and undertakes its debt collection efforts on its behalf. Her testimony demonstrated personal knowledge of Midland's business practices in purchasing debt and how the records created pursuant to those purchases are transferred and maintained. She also stated that records such as the bill of sale and assignment were always produced when Midland purchased debt.[4] Further, Praught testified that she has been trained on the computer system that maintains these records, that she has personal access to records, and that she personally reviewed the records for Walton's account before the trial and compared them with the information in the electronically stored files. Accordingly, regarding the purchase of the

---

[4] The fact that the bill of sale was created by Barclays does not disqualify Praught from testifying as to its authenticity. When Midland Funding purchased the debt from Barclays, the purchase was memorialized by a bill of sale as proof of the transaction. Even though the bill of sale was signed only by Barclays, the sale was a two-party transaction in which Midland Funding was, for practical purposes, a co-maker of the record. Accordingly, Praught's lack of knowledge as to Barclays's day-to-day operations does not negate her ability to lay the record's foundation.

Walton credit card account from Barclays, Midland provided a witness "whose knowledge of business practices for production and retention of the record is sufficient to ensure the reliability and trustworthiness of the record."[5] *Beneficial Maine Inc.*, 2011 ME 77, ¶ 12, 25 A.3d 96; *see also Deering*, 2016 ME 117, ¶ 14, 145 A.3d 551.

[¶22]  We next consider whether Praught, as a qualified witness, laid the proper foundation for admission of the documents in evidence.

1.  The record was made at or near the time by—or from information transmitted by—someone with knowledge.

[¶23]  Praught testified that the record of the assignment was obtained from Barclays at or near the time of the sale of the debt.  Although Praught did not specifically testify that the record was produced or transmitted by someone with knowledge, the court could reasonably infer those facts from the circumstances described by Praught.

2.  The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit.

[¶24]   Praught testified, based upon her personal knowledge, that Midland always obtained and maintained a record of the details of purchases of

---

[5]  These circumstances are markedly distinct from those where a third-party servicer with no connection to the owner of a debt (other than loan servicing) attempts to offer testimony regarding the owner's business practices.

debt such as the transaction with Barclays Bank that included the Walton account. That record, the bill of sale here, is part of the MCM records for which Praught serves as custodian.

> 3.  Making the record was a regular practice of that activity.

[¶25]   Praught's testimony confirmed that Midland's procuring and storing bills of sale reflecting purchases of accounts receivable was a regular practice of its business of acquiring ownership of unpaid debt. An electronic copy of that bill of sale is kept as a regular practice of MCM.

> 4.  All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11), Rule 902(12) or with a statute permitting certification.

[¶26]   Praught's testimony established that she is indeed a custodian of the records sought to be admitted in this matter. She has personal knowledge of how they came into existence and how they are stored.

> 5.  Neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

[¶27]   Nothing in the source of the documentation of the sale of the accounts from Barclays to Midland suggests a lack of trustworthiness. Praught's testimony indicated that Midland requires an explicit confirmation of the sale of accounts receivable as part of its routine practice. The transactional

records are clear upon their face. Walton's own admissions confirm the accuracy of the records reflecting his particular indebtedness.

[¶28] Accordingly, upon these facts, we find no abuse of discretion by the court in admitting the bill of sale in evidence pursuant to the business record exception to the hearsay rule, thus establishing that Midland Funding LLC is the sole owner of the credit card debt at issue in this matter.

The entry is:

Judgment affirmed.

Daniel L. Lacasse, Esq., Calais, for appellant Mark Walton

Ashley Janotta, Esq., Susan J. Szwed, P.A., Portland, for appellee Midland Funding, LLC

Calais District Court docket number CV-2015-009
FOR CLERK REFERENCE ONLY